# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| Plaintiff, | |
| v. | Case No. 15-00106-01-CR-W-DW |
| **TIMOTHY RUNNELS,** | |
| Defendant. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America respectfully submits its Sentencing Memorandum for consideration in the sentencing of defendant Timothy Runnels. On September 11, 2015, Runnels pled guilty to Count 2 of the Indictment, which charged Runnels with a civil rights violation under 18 U.S.C. § 242. Pursuant to the plea agreement, the Government agreed to recommend a sentence of no more than 48 months imprisonment. In advance of the sentencing scheduled on May 26, 2016, the government submits this sentencing memorandum in support of its recommendation for a sentence of forty-eight months imprisonment.

I.   **Factual Background**

  A.   **Summary**

On the afternoon of Sunday, September 14, 2014, Runnels pulled over B.M.'s Pontiac sedan because a warrant had been incorrectly associated with B.M.'s license plate. After B.M. repeatedly refused Runnels' commands to exit the car, the much larger Runnels unsuccessfully attempted to pull a physically-resistant B.M. from the vehicle. Runnels ultimately shot his Taser into B.M.'s chest and deployed the current for twenty seconds. During that time period, B.M., while at times screaming in pain, cooperated by exiting his vehicle and lying face down on the ground. Runnels then handcuffed B.M. behind his back and picked him up from behind. He

dragged B.M., who was limp and barely conscious, around the back of the Pontiac sedan and dropped him face-first into the ground, causing injury to his mouth and face. B.M. suffered cardiac arrest and stopped breathing at the scene. Medical personnel, who arrived at the scene within a few minutes, were the first to treat B.M. and ultimately resuscitated him by shocking him with an external defibrillator and performing cardiopulmonary resuscitation (CPR).

### B. Dash Camera Video of Incident

Dash camera video from Runnels' police cruiser captures the majority of the incident. The dash camera video has already been provided to the Court as an exhibit following the pre-sentencing conference with the parties.

Runnels' dash camera video shows his police cruiser exiting a McDonald's parking lot and pulling behind B.M.'s Pontiac sedan. After briefly following B.M.'s vehicle, Runnels activates his siren, and B.M. immediately pulls over to the curb in front of a friend's house that B.M. had intended to visit. While remaining in his car, Runnels asks a dispatcher to run B.M.'s license plate through the criminal inquiry database, and shortly thereafter, the dispatcher informs Runnels that there is an "association" with the license plate. Investigators later learned that an individual entering a warrant into the criminal justice database had incorrectly associated that warrant with B.M.'s license plate due to a typographical error.

Runnels exits his vehicle, walks to B.M.'s passenger-side window, and tells B.M. to lower the window. B.M. asks "For what?" and Runnels states that he cannot hear him. After B.M. replies that he can hear Runnels just fine, Runnels goes around to the driver-side door, opens it, and repeatedly orders B.M. to get out of the car. B.M. refuses to exit and instead asks several times "For what?" and "Am I under arrest?" After nine seconds of this exchange, Runnels says he is going to pull B.M. out of the car if he does not comply, requests back-up from his dispatcher,

and then begins to attempt to physically pull B.M. from the car. B.M., although largely out of view because he remains inside his car, resists Runnels and repeatedly asks whether he is under arrest.

After a few seconds, Runnels takes out his Taser, points it at B.M., and asks him "Do you really want to get Tased right here in the middle of your car?" B.M. responds, "I haven't done anything officer" and again asks "Am I under arrest?" After a brief attempt to pull B.M. out of the car with one hand, Runnels puts his Taser back on his belt and tells B.M., "Yes, you're under arrest." The two then engage in another physical struggle, as Runnels unsuccessfully attempts to pull B.M. from the car. During this struggle, B.M. repeatedly asks why he is under arrest but Runnels does not provide an explanation. After approximately twenty seconds of struggling, Runnels stops pulling, grabs his Taser, and points it at B.M. Runnels says, "Alright fine fuck it, just get out . . . out . . . out right now," and then, presumably seeing no movement by B.M., fires the Taser into B.M.'s chest.

For the next twenty seconds, the electrical buzz from the Taser's electrical current can clearly be heard on the dash camera audio recording, which indicates that Runnels continued to deploy current for that length of time. During the first several seconds of the deployment, Runnels continues to order B.M. out of the car and reports the Taser deployment to his dispatcher. As B.M., who is no longer speaking, begins exiting the car, Runnels grabs B.M.'s cell phone from his hand and throws it to the ground. Runnels then orders B.M. to get on the ground, and B.M., while moaning quietly, slowly finishes exiting the car. Once out of the car, B.M. immediately lies face-first on the ground with his arms at his sides and, as he does so, screams in obvious pain. Runnels had been deploying the Taser for twelve seconds up to this point. Runnels, who continues to deploy the Taser, replies to B.M.'s scream, "I told you." Runnels orders B.M. to put

3

his hands behind his back, but B.M. just moans while remaining on the ground with his arms prone at his side. After deploying the Taser current for six additional seconds after the moment that B.M. screamed in pain, Runnels reports to his dispatcher that he is "10-19," which means that he has a suspect in custody and that the situation is under control. After another two seconds of deploying the current, Runnels finally leans over, stops the Taser current, and handcuffs B.M. behind his back.

Runnels then reaches behind B.M.'s upper arms, picks him up, and drags him around the rear of the Pontiac sedan toward the curb. As Runnels is dragging him, B.M. remains limp with his head hanging forward and his legs dragging behind him so that his knees appear to scrape the ground immediately beneath Runnels. Once Runnels clears the back of the car, he drops the handcuffed B.M. face-first into the pavement. B.M. begins moaning immediately after he hits the ground, but otherwise does not appear to move.

As Runnels searches B.M., he says, "You don't like to play by the rules, do you?" Runnels requests medical assistance from his dispatcher and then repeatedly tells B.M. to sit up. B.M. moans in response, and Runnels says, "You better sit up. I don't play games." From this point onward, B.M. makes no audible sounds and his legs, which remain in the view of the camera, are motionless. Runnels next asks, "You just going to lay there on your side? Yes? Huh. That's fine." Runnels then again asks B.M. if he is ready to sit up and says, "I've been Tased a dozen times, doesn't [sic] act like that."

Another officer arrives on the scene approximately two minutes after B.M. became completely unresponsive. Runnels tells the officer that B.M. refuses to sit up and that B.M. nodded when Runnels asked him whether he wanted to remain lying on the ground. The other officer tells Runnels to sit B.M. up, and after Runnels does so, the second officer immediately tells

4

dispatch to "make it an emergency." Other officers soon arrive on the scene and stand over B.M., and at least one officer tells him multiple times to "wake up." At one point, Runnels repeats that B.M. had been "nodding and responding earlier [and that] he just didn't want to sit up."

Just as an ambulance pulls up, approximately four minutes after B.M. became completely unresponsive, unidentified officers begin to question whether B.M. is breathing. Soon thereafter, the officers notice that B.M.'s face is turning blue, and they relay this information to two emergency medical technicians (EMTs) as they are walking up to the scene. The EMTs appear surprised that B.M. is not breathing and does not have a pulse, and they immediately begin giving him CPR. This represents the first time anyone provides B.M. with medical assistance. The EMTs ask how long B.M. has been unresponsive, and Runnels replies, "Maybe two minutes — maybe." The EMTs ultimately shock B.M. with a defibrillator and are able to re-establish a pulse. The EMTs and fire department personnel, who also arrived on scene, then put B.M. in the ambulance and rush him to the hospital.

    C. Defendant's False and Misleading Statements

        i. Statements at the Scene

Runnels made several statements to other officers at the scene concerning his interaction with B.M., and a number of the statements were recorded by his vehicle's dash camera system. Runnels' statements are generally consistent with the video recording of the incident, with the significant exception of his cover story concerning how B.M. ended up face-first on the pavement with an injury to his head.

Runnels told the initial officer who arrived on the scene: "Because he starts fighting in the car and he doesn't want to get out and starts kicking. So rather than fight him in his own car — and then I just walked him over here and he started doing this." In addition, a few minutes later,

5

an officer outside of the view of the camera asked, "What did he fall and hit his chin?" and Runnels replied, "He went limp on me so I told him I was going to sit him down." Shortly thereafter, another officer outside the view of the camera asked Runnels whether B.M. hit his head on the pavement, and Runnels replied, "Yeah when he went limp right here I put him down . . . I brought him out, cuz he stood up and walked through the Tase . . . he came around the corner, he went down on the ground like he was supposed to . . . And then I cuffed him and then I got him up and he went limp on me. And I told him to sit up . . . and he went and laid there in that spot and you know how it gets." Several minutes later, a crime scene technician who arrived at the scene pointed to the pavement where B.M. had been lying and asked Runnels, "Is this where he went down?" Runnels responded, "[pointing to the car] I Tased him in the car, he walked part way then went limp and went down right there [pointing to the pavement where B.M. had been lying], and that's where he hit his chin."

A supervisor eventually arrived at the scene and asked Runnels to tell him what had happened. In terms of how B.M. ended upon on the pavement, Runnels said that B.M. walked "through the Taser" out of the car and lay down on the ground like he was "supposed to." Runnels stated, "I get him up, bring him over here, and he goes limp, and that's where he fell and hit his chin right there." Storey asked if Runnels then handcuffed him, and Runnels replied that he "handcuffed him right afterwards."

    ii. **Police Report**

Runnels authored a police report that was dated the same day as the incident. With respect to the Taser deployment, Runnels stated that he aimed the Taser at B.M.' chest and fired the barbs into his midsection. He wrote that B.M. then complied with the command to exit the vehicle and lay on the ground, at which point Runnels "removed [his] spent cartridge from the Taser, dropped

6

it on the ground, and re-holstered [his] Taser." Runnels stated that he then instructed B.M. to move to the curb, and when he did not comply, Runnels picked up B.M. and assisted him to the curb in order to "get him out of the flow of traffic for his safety." Runnels claimed that B.M. assisted him during the transport by moving his knees. He then wrote, "As I was lifting [B.M.] up by both arms to get over the curb, he then dropped his shoulders and went limp near the rear of his vehicle. I then dropped him, and he fell to the ground, striking his chin on the pavement."

### iii. Formal Statement to IPD Criminal Investigators

A few days after the incident, Runnels, in the presence of his attorney, gave a voluntary, recorded statement to IPD investigators. In terms of the incident, Runnels stated that he had reviewed his patrol car's dash camera recording prior to his statement and had reviewed his report. Runnels stated that he believed his report to be accurate. He also acknowledged that he had been trained in CPR/First Responder tactics and Taser use. He claimed that his Taser training occurred three years earlier when he first joined the department and that although Taser policy was mentioned in refresher trainings the student officers did not actually "use" the Taser during those refresher courses. He noted that this incident marked the first time that he used his Taser. Runnels indicated that his patrol car was equipped with an automatic external defibrillator (AED).

After describing B.M.'s verbal and physical resistance, Runnels explained the Taser deployment. He stated that he deployed the Taser into B.M.'s midsection and "let it run its complete cycle." He claimed that he believed "it's a five-second cycle." When asked if he had to squeeze the Taser a second time after the five seconds was over, Runnels replied, "no." Runnels said that he told B.M. to exit the vehicle and get on the ground. Runnels said that "B.M. "was able to move through the Taser and he lied on the ground and at that point the Taser cycle completed." When an investigator asks Runnels whether he believed he was deploying current

7

by holding down the button on the Taser, Runnels replied, "I believe so, I was letting it run its full cycle." Later when pressed on this issue, Runnels stated that he "kept the trigger pulled until the cycle was complete." When asked how long that took, he responded, "a few seconds, time for him to step out of the vehicle and get on the ground was around, around five seconds." Runnels said that "once he was on the ground, I released the trigger."

Runnels said that he then handcuffed B.M. and told him to "move over to the curb" but that B.M. did not comply with the order. As a result, Runnels grabbed B.M. underneath his shoulders from behind, in order to "assist" him to the curb. Runnels claimed that B.M. was not "complying" during the walk but was minimally assisting the officer. When pressed to clarify, Runnels stated that B.M. assisted Runnels by "moving his knees" but not by walking. Runnels said that he lifted B.M. up as they approached the curb and that B.M. went "fully limp." Runnels said that at that point, "I started to lose my grip and I know I'm going to drop him, so I tried to get him where he needs to be in the grass." Runnels acknowledged, however, that B.M. landed "on the concrete, next to the curbside." Runnels told investigators that he believed the "small" laceration to B.M.' chin was caused by the "fall," but that Runnels did not see the impact. He said that he thought that B.M. deliberately went limp because he did not want to comply.

While B.M. lay on the ground, Runnels said that he could hear him breathing but he did not observe movement except for a slight head nod in response to Runnels asking B.M. whether his positioning was all right. Runnels said that even after Sergeant Blackmore had him sit B.M. up, he still believed the individual was acting non-responsive and limp, and he was not concerned for B.M.'s well-being until another officer observed that B.M. was turning blue.

8

## II. The Plea Agreement and the Presentence Investigation Report

The defendant pled guilty to Count 2 of the Indictment which charged him with a civil rights violation for deliberately dropping B.M. headfirst onto the ground while B.M. was restrained and not posing a threat to the defendant or others. Pursuant to the plea agreement, the government agreed to seek a sentence of no more than 48 months imprisonment and permit the defendant to seek a non-custodial sentence.

The Presentence Investigation Report (PSR) concluded that the total offense level for the offense of conviction, including a 3-level reduction for acceptance of responsibility, is 30. Based on a Criminal History category of I and the maximum sentence allowed by the statute of conviction, the guideline range of imprisonment is 97 to 120 months.

## III. Guideline Issues

The defendant argues that the PSR incorrectly applied a cross-reference to the aggravated assault sentencing guideline, U.S.S.G. §2A2.2, because the defendant's use of the Taser was not a criminal act and the intentional drop did on its own does not support a basis for the cross-reference. Moreover, the defendant contends that even if the cross-reference applied with respect to the intentional drop, there should only be a 3-level increase for bodily injury and not a 5-level increase for serious bodily injury. Finally, the defendant alleges that a 2-level increase for the defendant's obstruction of justice is inappropriate given that the incident was captured on camera.

The government submits that the PSR correctly utilized the cross-reference to U.S.S.G. §2A2.2 in calculating the base offense level in this matter, as both the prolonged use of the Taser and the intentional dropping independently require the application of the cross-reference. The PSR correctly concluded that the defendant's conduct would constituted a felony Assault, Second Degree under §565.060, RSMo., under either subparagraph (2) ("… knowingly causes physical

9

injury to another person by means of a deadly weapon or dangerous instrument") or (3) ("recklessly causing serious physical injury to another person"). "Serious physical injury" for purposes of § 565.060, RSMo., is defined as "physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body." § 565.002, RSMo.

In terms of the first basis for a felony assault, causing physical injury by means of a deadly weapon or dangerous instrument, the defendant utilized such an instrument by deploying the Taser for approximately 20 seconds. Here, the defendant unpersuasively attempts to separate his use of the Taser from his conduct in dropping the handcuffed victim face-first onto the pavement. While it is correct that the defendant only entered a guilty plea to Count II of the Indictment, which covered his criminal conduct in using excessive force by dropping the handcuffed victim face-first onto the pavement, his plea agreement clearly indicates in ¶4 that he is liable for all his related criminal activity, that may be considered "relevant conduct" under U.S.S.G. §1B1.3, in establishing his offense level.

The defendant claims that his use of the Taser was not criminal in nature and implies that any improper use of the Taser stemmed from inadequate training. On the contrary, the video recording of the incident demonstrates that the defendant utilized the Taser as a punitive tool instead of a compliance tool. The defendant deployed the Taser for approximately 20 seconds, four times longer than the 5 second cycle that he was trained to deploy. The defendant's argument that he believed the Taser would shut off after 5 seconds is belied by the fact that an audible electrical current can be clearly heard in the video recording for the full 20 seconds in which the Taser was deployed. Moreover, the defendant told the pain-stricken victim "I told you" at approximately the 12-second mark of the Taser deployment, and then continued to deploy the

10

Taser for an additional 8 seconds after the "taunting" remark. Similarly, he radioed his dispatcher that the scene was under control at the 18-second mark but continued to deploy the current for an additional 2 seconds. The defendant's intent to punish B.M. by using the Taser can also be inferred from the context of the entire incident, namely that the defendant deliberately dropped B.M. onto the pavement for no legitimate reason, ostensibly as a punishment for B.M.'s lack of compliance, moments after the Taser deployment.

The cross-reference is also applicable because the defendant recklessly caused "physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body." Both of the defendant's criminal actions, the prolonged use of the Taser and the dropping of the handcuffed victim, resulted in separate and distinct injuries that would satisfy this standard. The prolonged use of the Taser caused B.M. to go into cardiac arrest, and the subsequent dropping of the handcuffed victim face-first onto the pavement resulted in a laceration to his chin and significant damage to his teeth and jaw (see ¶11 PSR – setting forth B.M.'s injuries). In terms of the latter injury, B.M. also sustained facial scarring as a result of the drop, which further supports the "disfigurement" portion of the "serious physical injury" definition as set forth in the Missouri statute. *See also State of Missouri v. Hughes*, 469 S.W.3d 894 (Mo. App. E.D. 2015) (upholding a conviction for second degree assault even though the victim did not have any dental injuries or broken bones, where the victim was in significant pain and had abrasions, bruising, scratches, and a black eye); *see also State of Missouri v. Roper*, 136 S.W.3d 891, 897 (Mo. App.W.D. 2004) (explaining that no minimum degree of trauma is required to establish "protracted loss or impairment" as long as it is more than momentary). The applicability of the injury caused by the intentional drop also mandates that a

11

5-level increase for serious bodily injury is required as opposed to the 3-level increase for bodily injury as requested by the defendant.

Finally, the PSR correctly applied a 2-level enhancement for "obstruction of justice." The fact that the dash camera of the defendant's patrol vehicle captures the entire incident does not excuse the false and misleading information that he provided in his field report and during his follow-up statement with the Independence Police Department. The defendant clearly had a motive to lie (and stick to his lie) with the hopes of misleading or obstructing the federal investigation. At no point, until his guilty plea, did defendant ever acknowledge that his actions were inappropriate (and criminal). The fact that the video helps to disprove his statements should not work to his benefit and result in a non-application of an applicable guideline enhancement.

## IV.   Sentencing Considerations in General

In any given case, a sentencing court is required to impose a reasonable sentence, which is reviewed for procedural error, then for substantive reasonableness under a deferential abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 50 (2007); *United States v. Booker*, 543 U.S. 220 (2005); *United States v. Washington*, 515 F.3d 861, 865 (8th Cir. 2008). While the Guidelines are no longer mandatory, they should be "the starting point and the initial benchmark" in determining an appropriate sentence. *Gall,* 128 S. Ct. at 597. Courts then are to consider the factors set forth in 18 U.S.C. § 3553(a). *Id.* Abuse of discretion under § 3553(a) occurs if a court fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only the appropriate factors but commits a clear error of judgment in weighing those factors. *United States v. Kowal*, 527 F.3d 741, 749 (8th Cir. 2008).

12

Case 4:15-cr-00106-DW   Document 34   Filed 05/20/16   Page 12 of 19

Discussing these factors in *United States v. Booker*, 543 U.S. 220 (2005), the Court stated:

The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The courts, in determining the particular sentence to be imposed, shall consider –

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –

(I) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the

13

>Sentencing Commission into amendments issued under section 994(p) of title 28; * * *

(5) any pertinent policy statement * * *

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

## V. Determination of the Appropriate Sentence

The government respectfully requests that the defendant be sentenced to 48 months imprisonment. Such a sentence is sufficient, but not greater than necessary, to comply with the sentencing purposes in 18 U.S.C. § 3553(a)(2) for the following reasons:

Such a sentence would reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the defendant's conduct. 18 U.S.C. § 3553(a)(2)(A). Although police officers face many difficult and stressful situations, they are entrusted with using reasonable force when making arrests and then in maintaining the safety of the arrestees. They are routinely trained, and in the current climate it is commonly known, that they can only use force when warranted and never as a punitive measure of "street justice." Here, the defendant clearly became frustrated with a young man who was refusing to acknowledge his authority, and the defendant decided to punish the victim in order to teach him a lesson. In doing so, the defendant violated the public's trust and his oath to uphold the law and Constitution. In this case, the defendant's actions were particularly egregious given the fact that the victim was much smaller than the defendant, the victim was semi-conscious during much of the assault, the victim was restrained during the intentional dropping, and the fact that the defendant failed to render medical aid or inform other

personnel of the cause of his facial injuries. The defendant's actions extended beyond the heat of the moment as he subsequently provided false and misleading justifications and explanations for the prolonged use of the Taser and intentional dropping of the victim.

The government submits that a sentenced of 48 months imprisonment would also serve as an adequate deterrence to such conduct in the future. 18 U.S.C. § 3553(a)(2)(B). Such a sentence reflects the seriousness of the defendant's offense and will deter other similarly situated law enforcement officers from committing similar offenses.

The defendant requests that the court grant a downward departure under U.S.S.G. §5K2.0 based upon the conditions of his confinement and his vulnerability to abuse while incarcerated because he is a former police officer. (Doc. 33 at 9) In support of this requested departure, defendant refers to the United States Supreme Court case of *Koon v. United States*, 518 U.S. 81 (1996) which involved officers involved in the infamous Rodney King beating in Los Angeles, California on March 2, 1991. The defendant is correct that the Supreme Court in *Koon* did not conclude the district court abused its discretion when it granted a departure under this subsection based upon susceptibility to abuse in prison. *Id.* at 111-12. However, it should be noted that the Court concluded that the susceptibility to abuse in prison was not based solely on the fact that the defendants were former law enforcement officers, but rather that fact coupled with "the extraordinary notoriety and national media coverage of the case". *Id.* The Court also noted that the officers were tried and acquitted in state court with the state "verdicts touched off widespread rioting in Los Angeles . . . [m]ore than 40 people killed . . . more than 2,000 were injured, and nearly $1 billion in property was destroyed." *Id.* at 88. These factors are simply not present in the instant case. The defendant in this case is a local police officer from Independence, Missouri

15

and outside of that fact, there are simply none of the extenuating circumstances that would justify a departure under § 5K2.0. *see United States v. Colbert*, 172 F.3d 594, 597-98 (8th Cir. 1999) (finding no abuse of discretion for denying departure because no extraordinary publicity); *United States v. Rok*, 71 Fed. Appx. 150 (3rd Cir. 2003) (district court correct in denying departure request because no extenuating circumstances present beyond mere fact that defendant was a police officer); *see also United States v. Blount*, 982 F. Supp. 327, 336 (U.S. Dist. Ct. E.D. Pa 1997) (court finds attorney not ineffective for failing to raise a *Koon* based departure request at the time of sentencing hearing).

The defendant next requests a downward variance to a probationary sentence partially based on the facts that the defendant accepted responsibility for his actions, "willingly" left the police force, and is unlikely to commit the same crime against the public in the future. While the government questions the defendant's assertion that he willingly left law enforcement, it submits that the defendant has taken responsibility for intentionally dropping the victim and concedes that the defendant is unlikely to recommit a similar crime in the future. The government points out, however, that a sentence of 48 months imprisonment takes into account these factors. Such a sentence is already less than half of the low end of the guideline range of imprisonment is 97 to 120 months imprisonment.

The defendant also requests a probationary term because he will allegedly face additional risks as an inmate compared to other convicted prisoners. Here, the government notes that Bureau of Prisons has the means and capability to protect such individuals and, in fact, routinely does so. Such a basis for a variance would support an unjust and paradoxical situation where

16

those who are entrusted to enforce the law are precluded from ever being imprisoned for breaking the law.

Finally, the defendant references several courts that have sentenced police officers to probationary terms for civil rights convictions. The government notes that each criminal case is distinct and must be evaluated based on the facts, circumstances, and laws governing the individual case. In this case, the defendant deployed a Taser against B.M. for a duration four-times longer than mandated by his training and continued clearly after B.M. was complying with his requests and was no longer a threat. He handcuffed the victim, and then dropped him face-first onto the pavement. He ignored the victim's cries of pain, failed to provide medical treatment, and did not inform responding personnel as to the cause of B.M.'s injuries. These egregious acts put B.M. into cardiac arrest and caused significant damage to his face. All of the involved parties are fortunate that B.M. did not lose his life as a result of the defendant's actions. Such egregious behavior is distinct from many of the cases cited by the defendant. In any event, the issue of disparity in sentences is largely addressed by the sentencing guidelines. "[I]n the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough v. United States*, 552 U.S. 85, 89 (2007); *see*, *e.g.*, *Gall v. United States*, 552 U.S. 38, 46 (2007) (guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"). Moreover, within-guidelines sentences promote Congress's goal in enacting the Sentencing Reform Act – "to diminish unwarranted sentencing disparity." *Rita v. United States*, 551 U.S. 338, 354 (2007). Moreover, the issue of the defendant

17

receiving a disparately long sentence is particularly moot here, as the government is recommending a sentence at less than half of the low end of the sentencing guidelines.

## VI. Conclusion

For the foregoing reasons, the government respectfully recommends that the defendant be sentenced to 48 months imprisonment.

Respectfully submitted,

By: */s/ David M. Ketchmark*

DAVID M. KETCHMARK
First Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 E. Ninth Street, Suite 5510
Kansas City, Missouri 64106
Telephone No. (816) 426-3122

VANITA GUPTA
Principal Deputy Assistant Attorney General
Civil Rights Division
United States Department of Justice

By: */s/ Shan Patel*

Shan Patel
Trial Attorney
Criminal Section
Civil rights Division
United States Department of Justice

18

CERTIFICATE OF SERVICE

      The undersigned hereby certifies that a copy of the foregoing was delivered on May 20, 2016, to the CM-ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record.

                                                  */s/ David M. Ketchmark*
                                                  David M. Ketchmark
                                                  Acting United States Attorney